UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

UNITED STATES OF AMERICA      )
     )      Case No. 1:08-cr-4
v.      )      *Collier / Lee*
     )
NATALYA PUNTO      )
JACQUALINE R. BANKS      )


## REPORT AND RECOMMENDATION

### I.    Introduction

Defendants Natalya Punto ("Punto") and Jaqualine R. Banks ("Banks") (collectively the "Defendants") filed a joint motion to suppress evidence located in a Lincoln Navigator [Doc. 35].[1] The joint motion was referred for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) [Doc. 37]. An evidentiary hearing on the joint motion was held June 24, 2008. The parties have filed memoranda addressing the issues raised in the joint motion [Doc. 37, 38, 39, 67, 71, 72 & 73], which have been carefully reviewed and fully considered.[2]

In summary, I find no constitutional violation with respect to the stop, detention, and search of the Navigator. Thus, for the reasons set forth herein, I **RECOMMEND** that Defendants' joint motion be **DENIED**.

---

[1] Originally, Defendant Francisco Lake ("Lake") participated in the joint motion. However, prior to the evidentiary hearing, Lake filed a notice striking the motion to suppress as it related to him [Doc. 59]. Therefore, this report and recommendation will not address any issues pertinent solely to Lake.

[2] In addition, Defendants filed a motion for leave to supplement the record to include the affidavit of Katie Chestnut [Doc. 70], which motion was granted without objection [Doc. 74].

## II.     Evidence

At the evidentiary hearing, the United States offered the testimony of Chattanooga Police Department ("CPD") officers involved in the traffic stop and subsequent search of the Navigator at issue, Sergeant Robert Lewis ("Lewis"), Officer Thomas Raulston ("Raulston"), and Officer Nicholas Allen ("Allen").  The Defendants presented the testimony of Melissa Sargent ("Sargent"), a dispatcher in Catoosa County, and Deputy Richard Todd Pitts ("Pitts") of the Catoosa County Sheriff's Office [Doc. 69].

### A.     Testimony of Sergeant Lewis

Lewis testified as follows: Lewis is a supervisor sergeant with the CPD and has been with the CPD for fourteen years.  A portion of the traffic stop at issue is captured on Lewis' patrol car videotape, which was played and made an exhibit at the hearing.

On November 15, 2007, Lewis was patrolling west-bound I-24 when he observed two vehicles following each other amid a moderate flow of traffic.  The front vehicle was a Jeep Cherokee and the rear vehicle was a Lincoln Navigator, both with Georgia plates.  Lewis clocked one of the vehicles traveling 61 mph in a 55 mph zone with his radar equipment.  By observing both vehicles, he determined the un-clocked vehicle was also speeding.  Lewis thought the Navigator was also following the Jeep too closely; however, this was not included in the Uniform Arrest Report completed by Lewis, which was made an exhibit.  Lewis "ran" the tag on the Navigator and the computer reported the Navigator's registration was expired. He then contacted Raulston, who was also on patrol, and requested aid in pulling over both of the vehicles simultaneously.

As Lewis followed the vehicles, the Navigator pulled ahead of the Jeep and the vehicles separated.  Lewis pulled the Jeep over for going 61 mph in a 55 mph zone and upon doing so he

observed furtive movement in the passenger seat of the vehicle. He had the driver exit the Jeep and requested vehicle and driver information. The driver offered a Georgia driver's license and a car rental agreement. The rental agreement revealed the Jeep was overdue as it was due for return on October 26, 2007. The rental agreement also reflected the Jeep was rented to Jessica Chang ("Chang"), who was not present in the Jeep. Within five minutes of the stop the driver claimed Chang was in the Navigator. Lewis then contacted Raulston, via cellular phone, and asked if Chang was in the Navigator. Raulston eventually told Lewis that Chang was not in the Navigator. Lewis communicated to Raulston that he should continue his investigation of the Navigator, but if nothing came of it, Raulston should release the Navigator. Lewis was unaware of what was going on at the stop of the Navigator other than what was relayed to him by Raulston.

Lewis was concerned the Jeep was possibly stolen. He ran a records check of the driver and the Jeep. Lewis testified his initial suspicions of criminal activity increased throughout the duration of the stop due to both his own observations and the information he received from Raulston. Lewis' suspicions increased because of the absence of Chang, furtive movement in the Jeep, the rental agreement was overdue and provided the Jeep was not to be taken outside the State of Georgia, the nervousness exhibited by the occupants of the Jeep, and the differing claims concerning whether the vehicles were traveling to Nashville or Memphis.

Lewis asked the driver if there was anything illegal in the Jeep, like guns or drugs. He then proceeded to ask the driver for permission to search the Jeep. Lewis testified he wanted to search the Jeep because of the furtive behavior by the passengers – who he believed had stuffed something under the seat – as well as the conflicting stories between the occupants of the Jeep and the Navigator and the conflicting stories among the passengers of the Jeep. The driver eventually

consented to a search, but Lewis requested a canine unit because the driver was being "iffy" about the consent.

Lewis observed portions of the canine sniff of the Jeep and was told by Allen, the dog handler, that the dog had alerted to the Jeep. Allen also informed the driver of the Jeep that the dog had issued an odor response. Lewis does not know how the dog alerts and deferred such questions to Allen. The driver was again asked for consent to search the vehicle, although consent was not required given the dog alert. Despite the canine alert, illegal drugs were not found in the Jeep. At some point, Lewis was informed the dog had alerted on the Navigator as well and that no illegal drugs were located in the Navigator either.

Lewis's patrol car video/audio equipment was activated during portions of the stop, but gaps occur where Lewis turned off his audio equipment during times he communicated via his personal cellular telephone.[3] Lewis testified he typically turns off the audio on his recording equipment whenever he steps away from any potential defendants or traffic violators to make telephone calls. Lewis says he turns off his audio equipment to avoid recording his phone calls so the audio does not get "all mixed up." The following is a synopsis of the events at issue as reflected in the videotape:

**00:54:00:** Lewis communicates with Raulston about pulling over the Jeep and Navigator. Lewis mentions both vehicles were speeding.

**00:55:23:** Lewis informs Raulston the tag on the Navigator is also expired. Moments later, Lewis notes the vehicles are changing behavior, says occupants have been on phone, and the

---

[3] The timelines herein are simple estimates and the descriptions are summarizations based upon my review of the video evidence. I recognized that the video evidence may not necessarily offer a complete picture of the stop and its attendant circumstances, however, at the request of the Defendants, I have reviewed and considered all of the videotape evidence for purposes of this report and recommendation.

Navigator is now pulling ahead of the Jeep and the Jeep is exiting the interstate.

**00:57:27:** Lewis activates his blue lights to pull over the Jeep and tells Raulston to hurry to catch the Navigator.

**00:58:21:** Lewis asks driver to exit Jeep, and asks for registration, insurance and license. He also confirms the Jeep and Navigator are traveling together and informs the driver he was speeding.

**00:59:43:** Lewis asks about expired rental agreement, details of rental agreement, whereabouts of Chang (driver says he has permission to drive from Chang), where they were headed (driver answers Memphis), why they were going to Memphis (driver says to visit some friends for a few days) and if they were traveling with the Navigator (driver answers yes).

**01:01:34:** Audio is turned off.

**01:02:38:** Lewis appears to talk with passenger(s), gets ID and returns to squad car.

**01:11:08:** Lewis appears to talk to driver in front of squad car.

**01:13:30:** Lewis appears to engage in pat-down of the driver. Lewis then returns to the Jeep and appears to talk with the occupants of the Jeep.

**01:18:04:** Audio is turned back on in Lewis' patrol car and he is communicating with an unidentified individual on what appears to be his cellular telephone. Only Lewis' responses are heard and his responses appear to be related to receiving information for the most part.

**01:19:48:** Lewis asks driver where he spent time in prison and driver responds.

**01:23:34:** Lewis is communicating with an unidentified individual and only Lewis' contributions to the conversation are audible.

**01:26:37:** Lewis tells the driver he is concerned about where they are going and what they are up to, and asks if there is anything illegal, drugs, money or guns in the vehicle.

**01:27:04:** Lewis asks if there are any objections to him searching the Jeep. Driver appears to consent but says he does not understand why a search is necessary and questions probable cause.

**01:27:55:** Lewis asks the dispatcher to send out a canine unit.

**01:28:18:** Lewis asks the driver how he knows a passenger (now co-defendant), Crawford.

**01:28:53:** Lewis makes or takes another call and turns off audio as he begins to discuss something.

**01:29:17:** Lewis appears to have a male passenger get out of the Jeep and speaks to him then sends him to stand with driver at patrol car. Lewis then speaks to remaining occupants of the Jeep.

**01:30:56:** Audio is turned back on.

**01:31:37:** Lewis talks to a female passenger in the Jeep, stating the Jeep's rental agreement provides it is not to leave Georgia and the renter is not in the Jeep. Lewis asks the passenger about guns, drugs, fraudulent documents, or other illegal items in the Jeep. Lewis questions the strong smell of cologne in the Jeep. Lewis asks about where they are going, employment and other information and questions person about perceived inconsistencies.

**01:37:34:** Lewis talks to an unidentified individual about waiting for the canine, noting the driver is an ex-convict, the Jeep is not rented to any of the occupants, and other suspect behaviors. Lewis says he thought at first they might have a "load of dope" but now thinks it may be something else.

**01:38:54:** Lewis asks the female passenger to get out of the Jeep.

**01:39:41:** Lewis again turns off the audio in his car.

**01:40:50:** Audio is turned back on briefly.

**01:41:08:** Audio is turned off.

**01:47:11:** Canine unit appears to begin sweep of Jeep.

**01:48:39:** Audio is turned back on and Lewis informs the driver that the dog responded to the Jeep. Once again Lewis asks for permission to search and the driver says he does not care. Moments later, Lewis appears to tell Allen that Raulston is waiting for him.

**01:54:23:** Lewis says there is an ID in the Jeep under the carpet.

**02:10:30:** Lewis is heard saying, apparently to another officer, that he thinks he has figured it out and, as he suspected, it is not dope, but may involve fraudulent credit cards. Lewis questions the occupants about their IDs and bank cards, and a credit card scam. Lewis also questions the female passenger about the dates on the driver's licenses. She says the Jeep was going straight to Memphis, but does not know if the others were going to Nashville first. He also questions the other occupants about their wallets and certain gift cards.

**02:17:18:** Lewis tells the passengers to get back in the Jeep and talks to the driver again.

**02:18:24:** Lewis talks to Raulston about whether he found anything and asks whether he needs to hold the Jeep's occupants. Lewis gives Raulston the names of the Jeep's occupants, noting their Georgia drivers licenses were all issued within days of each other.

**02:21:51:** Lewis asks the male passenger, Crawford, about what Crawford said was his "novelty" ID, which was slipped under the carpet. The passengers are ordered out of the Jeep again and the search for the "novelty" ID continues.

**02:28:14:** Lewis asks Raulston questions about the occupants of the Navigator and whether Terry Ford is in the Navigator. He also asks about Ohio licenses.

**02:30:20:** Lewis comments to someone that he has engaged in a lot of work for nothing, a credit card scam. Lewis says he is going to put one of them in jail (the one with the novelty ID) and

he needs to find something like that to put the other two in jail.

**02:31:31:** Lewis asks the female passenger if she has any novelty IDs and she replies no. He also asks her about the "novelty" ID of Crawford, her husband/the male passenger. Lewis says it is not a "novelty;" it is a fraudulent ID.

**02:32:53:** Audio is turned off and camera is now facing the back of the patrol car, and Crawford appears to have been placed in the back of the patrol car.

**03:03:56:** Audio is turned back on and the occupants are asked to confirm they received their belongings back. Lewis essentially says he is charging Crawford with criminal impersonation based on the ID.

**03:05:47:** Audio is turned off

**03:16:47:** Videotape ends.

### B.     Testimony of Officer Raulston

Raulston testified as follows: Raulston has been an officer with the CPD for seven years and has a total of thirteen years of experience in law enforcement. Portions of the traffic stop of the Navigator were captured on Raulston's patrol car videotape, which was played and made an exhibit at the hearing.

On November 15, 2007, Raulston was contacted by his supervisor, Lewis, who requested his aid in pulling over two speeding vehicles. Lewis also told him the Navigator had an expired tag. Raulston caught up with the Navigator, which was traveling in the slow lane of traffic, and clocked its speed on his radar equipment as being 62 m.p.h. in a 55 m.p.h. zone. Raulston "immediately" noticed the registration sticker on the tag was blocked by a decorative tag bracket. Raulston stopped the Navigator around 12:57 a.m.

Raulston asked Punto for her license and proceeded to question Punto and Lake. Punto, who had a driver's license issued in New York, was cooperative throughout the course of the conversation, informing Raulston of a previous traffic stop in Catoosa County where she said the officer established the registration was valid. Lake, on the other hand, was argumentative and extremely nervous according to Raulston. Lake was arguing that his tag/registration was not expired. At that time Raulston had not performed his own records check of the registration and he was relying on the information relayed from Lewis that the registration was expired. He had, however, noted the registration violation based on the decorative tag bracket, which obscured the sticker. Raulston said he never told Punto or Lake about the speeding violation because Lake was being so argumentative about the registration violation. At some point that night, Raulston's patrol car computer equipment indicated, apparently in error, that the registration on the Navigator was expired.

After obtaining Punto's license, Raulston requested a records check of Punto's license. Raulston said one of the reasons for the length of the stop was that he was waiting to receive the results of the computer check of Punto's driver's license from his patrol car computer equipment in order to determine whether to issue a citation and allow the Navigator to leave. Raulston could not recall when he received information confirming Punto's driver's license was valid, but testified it was later in the stop. He also noted his patrol car computer was running slow that night based on the chimes he heard during the video evidence played during his testimony.

A report prepared by the Tennessee Bureau of Investigation referred to as a "PAL report" was submitted into evidence at the hearing, but Raulston had not seen a PAL report before and was unsure about the meaning of all of the entries on the PAL report. Raulston believed the PAL report

9

indicated the Navigator's tag number was called in for a records check. Raulston testified he did not receive return information regarding the registration until sometime later in the stop.

Raulston acknowledged that soon after the stop was initiated, Lake informed, as well as showed, Raulston the tag had a current registration sticker under the decorative tag bracket, which was at least partially concealing the sticker. Raulston then informed Lake that it was illegal to conceal the vehicle's registration sticker. After this exchange, Raulston requested Lake's license for a records check. He testified he was checking Lake's license because he still had not received information back regarding Punto's license and thought Lake might have to drive the Navigator if he did not timely receive information regarding Punto's New York license.

Early in the stop, Raulston received a phone call from Lewis concerning whether Chang, the renter of the Jeep, was in the Navigator. To this point in time, Raulston mistakenly thought Banks was a juvenile and he had not ascertained her name or obtained identification ("ID") from her. At that time, he had the names of Punto and Lake and did not know the name of the person he thought was a juvenile in the back seat of the Navigator. Raulston told Lewis that Chang might be the juvenile. Later in the stop, Raulston realized Banks was not a juvenile and not named Chang. Raulston also was informed at some time during the detention that the Defendants were traveling "to Nashville to party."

Raulston reported to Lewis that Lake's extreme nervousness made him suspicious of criminal activity. Raulston decided to conduct a records check through the Blue Lightning Operations Center (BLOC). Raulston testified he normally requests information from BLOC if he is suspicious of criminal activity. Raulston thought he was aware of the conflicting stories and the nervous, argumentative and "standoffish" behavior of Lake at the time he decided to request information from

BLOC. Lewis informed him that if everything checked out he should "cut them loose." Raulston transmitted the vehicle's tag number as well as information concerning Lake and Punto to BLOC. At his point, Raulston had in his possession the Navigator's registration, the driver's licenses of both Lake and Punto, and Lake had shown him the valid registration sticker on the tag.

Raulston asked Lake if they were traveling with the occupants of the Jeep and Lake confirmed that they were traveling together. Raulston also informed Lake that if Punto's license was found to be invalid he would have to drive.

Raulston initiated a conversation with the remaining two occupants, Punto and Banks, who indicated they did not know the occupants of the Jeep. Later in the stop, Banks admitted to Raulston she initially lied about whether she knew the occupants of the Jeep because she was having a relationship with a married man in the Jeep whose wife was also in the Jeep.

Raulston requested permission to search the vehicle and Lake refused. Raulston then proceeded to "pat down" Lake and felt a bulge in his right front pocket, which Lake said was $2,500. It was later determined to be a little more than $2,900.00. Raulston also asked Lake if there were any drugs in the vehicle and Lake responded there were not. Raulston once again conversed with Lewis and concluded the story he had been given regarding travel to Nashville differed from the story Lewis was given regarding travel to Memphis.

Raulston requested that Lewis send the canine unit to conduct a canine sniff of the Navigator he was suspicious of criminal activity. On cross examination, Raulston described the criminal activity as "something in the car" but he did not know if it was "drugs or what." Raulston based his suspicions on the nervous behavior and pacing by Lake, Lake's "standoffishness," the conflicting stories among the occupants of the vehicles regarding their destination, the fact that two of the

occupants were from different parts of Georgia and one was from New York, and the conflicting stories about whether the occupants of the Navigator knew and/or were traveling with the occupants of the Jeep.

While Raulston may have been writing the citation, he received a phone call from BLOC with his requested information. Around 1:34:38 a.m., BLOC stated Lake had an extensive criminal history of drug smuggling and credit card fraud and that his person as well as his surroundings should be searched if possible. Raulston did not receive any indication that either Punto or Banks had a criminal history. Raulston said that as a result of the information he received from BLOC, he detained the Navigator and its occupants until the arrival of the canine unit, although he had already formed his intent to do so prior to receiving the BLOC information. Raulston also requested backup because at some point BLOC advised him one of the occupants of the Jeep had shot at the police in the past. On redirect examination, Raulston said it was not until he heard from BLOC around 1:34:38 a.m. that he knew Punto had a valid license, no border crossing violations, and no outstanding warrants.

The canine unit arrived at the scene and Raulston asked both Punto and Banks to move to the left in preparation for the canine sweep which, along with the location of Lake, blocked the camera's view of the canine sniff, thereby preventing the canine alert from being recorded. Raulston did not recall observing the dog sniff; however, he was informed about the dog's alert by Allen. After the alert, Raulston gave Punto a warning ticket for the registration violation. Raulston also informed Lake that the dog had alerted to his Navigator. Raulston said he gave a warning citation instead of a regular citation on the registration violation because he had conflicting information about the registration.

Raulston, along with other officers, began to search the Navigator. Raulston removed the middle console/drink holder and found a black bag containing several hundred credit cards. The cards were separated into five different bundles with matching IDs. The pictures on the identification were of Punto, Banks and George Crawford ("Crawford") (one of the occupants of the Jeep). In the cargo area, two laptop computers, a credit card machine, and a printer were located.

The warning ticket issued by Raulston was entered as an exhibit at the hearing. No boxes were checked concerning the legal basis of the search; however, Raulston testified he had probable cause based upon the conflicting stories, nervousness, and the dog alert.

The videotape evidence from Raulston's patrol car reflects the following:

**00:57:37:** Raulston activates blue lights.

**00:57:45:** Raulston pulls the Navigator over. Seconds later, the camera automatically zooms in on the Navigator's tag.

**00:58:20:** Raulston goes to the passenger side of the vehicle and initiates conversation.

**00:58:30:** Raulston tells occupants the tag is expired, but does not mention speeding. Lake appears to tell Raulston tag is current and they had just been stopped in Catoosa County. Raulston tells him that the computer shows it is expired and states the decorative tag is also a violation. Lewis obtains Punto's license and the Catoosa County citation.

**00:59:45:** Raulston returns to the patrol car, apparently to run a records check.

**01:01:42:** Raulston talks to Lewis and tells him the Navigator was stopped in Catoosa County and has seen the citation. Lewis tells Raulston to make sure "everything looks legit." Chimes can be heard in the background for the next few minutes, which, based on the testimony, indicates requests for and/or receipt of information on the patrol car computer.

**01:06:48:** Raulston asks Lake to get out of the Navigator and requests his ID. Raulston tells Lake he cannot get verified information on Punto's license and says the computer system tag shows the tag is expired.

**01:07:20:** Lake shows Raulston the current registration sticker on the tag.

**01:07:43:** Raulston asks where they are going and Lake responds Nashville.

**01:07:53:** Raulston tells Lake he is going to run his ID and that Lake can sit down in the Navigator. Raulston returns to his patrol car.

**01:08:24:** Raulston receives a call from Lewis who asks who is in the Navigator. Raulston responds that the occupants are an older Hispanic male, a younger Hispanic female and what looks like a Hispanic female juvenile and also reports the occupants look like they have been traveling and the guy (Lake) is "being very standoffish." Upon request, Raulston confirms Lake is in the Navigator and Lewis asks whether Chang is in the Navigator. Raulston replies that she is "probably the female in the back" of the Navigator and she looks like a juvenile. Lewis tells Raulston that "if you've got a good feeling, go ahead and cut them loose" and he thinks his vehicle is "screwed up." Lewis tells Raulston to check to see whether the occupants of the Navigator confirm the vehicles were traveling together. Lewis reports to Raulston the occupants of the Jeep said the two vehicles were traveling together and that Chang was in the Navigator and she rented the Jeep. They also discuss the past due rental and the restriction to Georgia. Raulston tells Lewis the female driver "seems legit" but he might run Lake on BLOC to "see what comes back on him."

**01:11:26:** Raulston is heard requesting a check (apparently from BLOC) on Lake and the Navigator. Raulston interrupts the call when he sees Lake begin to approach patrol car.

**01:12:19:** Lake approaches Raulston in order to give him the Navigator's registration

paperwork. Raulston asks if they are traveling with another vehicle and Lake replies "not now." Raulston also asks him about the identity of the passenger in the backseat and the response by Lake is not audible on the videotape. Lake returns to the Navigator and Raulston continues his call, providing information for the check on Punto and Lake.

**01:15:41:** Raulston ends call then contacts someone and states that BLOC should be calling.

**01:17:30:** Raulston gets out of vehicle and gets Lake out of the Navigator. Raulston talks to Lake about the conflicting stories. Lake admits he knows Jeep's occupants. Lake tells him they are going to a party in Nashville. Raulston tells Lake he still has no license information regarding Punto and that he (Lake) may have to drive. Lake remains near the patrol car and Raulston appears to question Punto and Banks who remain in the Navigator, but the conversation is impossible to decipher. Raulston returns to his patrol car for a few minutes.

**01:26:15:** Raulston gets out of squad car and asks Lake for permission to search his vehicle and if there are any drugs in the car. Lake answers no to both questions. Lake says that he does not want his vehicle searched because it is a violation of his rights. Raulston says he is getting conflicting stories from Lake and passenger and occupants of Jeep.

**01:27:32:** Raulston pats down Lake.

**01:27:39:** Raulston feels money in Lake's pocket and asks how much there is. Lake responds $2,500.00.

**01:28:20:** Raulston contacts Lewis and tells him there are conflicting stories as to whether the Navigator's occupants know the Jeep's occupants. He asks Lewis to send the canine unit.

**01:33:56:** Lake asks if he can get back in his car. Raulston denies the request and states he is writing a citation.

**01:34:16:** Raulston receives a call, apparently from BLOC. Raulston requests additional assistance. Raulston requests information on Banks, noting he did not request information regarding Banks earlier because he mistakenly thought she was a juvenile. This call last for several minutes.

**01:42:14:** Call ends and Raulston informs another officer, who apparently has arrived on the scene but is off camera, that Lake is a "drug smuggler." Raulston states that BLOC lists Lake as a drug dealer to be searched. Raulston says a canine unit has been requested, and that Lake has a large sum of cash on him. Raulston then appears to relay the same information to Lewis.

**01:44:06:** Raulston asks Banks and Punto to get out of the vehicle. Raulston questions Banks about whether she knows one of the males in the Jeep but the conversation is difficult to understand.

**01:47:50:** Raulston tells Punto that he is going to write a citation. She notes it is not her car and adds that she had just gotten a warning ticket from the prior stop in Catoosa County. Raulston questions her about her knowledge of Lake; then Raulston returns to the patrol car where he can occasionally be heard talking to another officer on the scene about inconsistencies in the information provided by the occupants of the vehicles.

**01:52:26:** Raulston has Punto and Banks move to stand in front of the patrol car.

**01:53:06:** Raulston gives Punto the warning citation.

**01:53:51:** Dog and canine handler are visible for the first time. Dog search begins but is not captured on camera.

**01:54:35:** Punto is asked to sign the citation by Raulston.

**01:55:05:** Raulston is informed that the dog has "hit" on the vehicle. Raulston asks if it was a "good" hit and he is informed it is and the handler describes the alert.

**01:55:17:** Raulston tells Lake the dog alerted on the Navigator, says he will search the Navigator and again asks if there are any drugs in the vehicle. Lake says there are no drugs and also questions whether the dog alerted because the handler was touching the Navigator.

**01:56:08:** A search of the Navigator begins and eventually officers mention credit cards.

**02:03:23:** Raulston asks Lake about the credit cards. Lake says he actually has $2,900.00 on his person.

**02:04:37:** Lake is put in Raulston's patrol car and the remainder of the video footage appears to consist of footage of Lake silently sitting in the rear of the patrol car.

### C.    Testimony of Officer Allen

Allen has been an officer with the CPD for eight years and a canine handler for the last three and a half years. He and his dog, "Copper," went through a twelve week initial training program in 2006 to develop as a team. He and Copper also attended a 40 hour canine enhancement school in Mississippi where he was tested and trained on six different odors. He also trains with Copper for a full day every Wednesday. Copper is trained and certified through the United States Police Canine Association (USPCA) once a year. On the night at issue, Copper was trained and certified.

On November 15, 2007, Allen was asked to deploy Copper at the Jeep and Navigator, and he began at the Jeep. He first stimulated the dog to conduct a free air sniff for narcotics at the Jeep. This gives the dog an opportunity to locate the odor on his own. A directed search was performed next, which was done in a "W" pattern around the Jeep, and Cooper was directed to sniff certain areas in the "W" pattern. Allen stated the handler does not usually scratch the vehicle during the canine sweep but at times may properly do so. Any combination of standing on two paws, scratching, biting or barking is an indication of an alert by Copper. Allen said Copper gave an

alert/indication at the Jeep.

At approximately 1:50 a.m., Allen arrived with Copper to perform a narcotics sweep of the Navigator. The dog alerted on the Navigator during the directed search. Often the dog sniff is videotaped, however, it was not in this instance.

Allen acknowledged that Copper alerted twice that night and that both searches failed to reveal the presence of narcotics. However, he testified it is not unusual for a drug-detection dog to indicate on a car where there is residual odor but no narcotics. In his opinion, the fact that Copper alerted and no narcotics were found does not indicate that Copper is not reliable because Copper is trained to alert to odors, not the actual presence of narcotics. Allen noted in training he has determined Copper is much more likely not to alert at all than to alert falsely and that the percentage of times Copper alerts to a control vehicle without residual drug odor is extremely low. In Allen's opinion, Copper is a reliable drug-detection dog and was reliable on November 15, 2007.

### D.    Testimony of Melissa Sargent

Sargent testified as follows: She is a shift supervisor with the 911 dispatch center in Catoosa County, Georgia. Through her job, Sargent has become accustomed to dealing with CAD Incident Reports. The CAD Incident Report for the traffic stop of the Navigator performed by Pitts in Georgia was entered as an exhibit at the hearing. The report indicated Pitts called in the vehicle information; however, it did not indicate whether the vehicle's registration was current. Sargent checked the vehicle's registration the morning of the hearing and, at that time, it was current.

The Navigator's Vehicle, Title and Tag Information, from the Georgia Motor Vehicle Division, was entered as an exhibit at the hearing. According to the documentation, the registration was current at the time of the stop at issue. However, this is not documentation Sargent normally

uses to determine whether a vehicle's registration is current. She did not know at what time this information was made available or if it was available to the CPD on November 15, 2007.

### E.  Testimony of Deputy Pitts

Pitts testified as follows: He is employed with the Catoosa County Sheriff's Office and has been for five years. He conducted a traffic stop of the Navigator on November 14, 2007, shortly before the stop at issue, for failure to maintain lane. While the computer paperwork indicated he did in fact check the vehicle's registration, he did not recall whether the registration was expired or if he had issued a warning for an expired registration. Pitts also stated that he does not normally issue a citation for an expired registration of less than two months. He issued a verbal warning to Punto for failure to maintain lane and completed the traffic stop.

### F.  Additional Evidence

As noted, the PAL report was made an exhibit at the hearing and the Affidavit of Katie Chestnut ("Chestnut") was accepted as late filed evidence [Doc. 71-2]. Based on the PAL report, Chestnut states the driver's license information for Punto was requested at 1:03 a.m., and the validation of her New York license was communicated to the server that submits the information to the patrol car unit at 1:03 a.m. Thus, based on the PAL report, Chestnut states the information "should have been available to" Raulston around 1:03 a.m.

## III.  Analysis

Defendants' joint motion involves a non-consensual, investigative detention. *See United States v. Avery*, 137 F.3d 343, 352 (6th Cir.1997). Given the issues raised in the Defendants' joint motion, the initial stop of the Navigator, the detention of its occupants, and the subsequent search of the vehicle are all acts which must be separately considered. *See United States v. Bentley*, 29 F.3d

1073, 1075 (6th Cir.), *cert. denied*, 513 U.S. 1028 (1994). Therefore, this report and recommendation will address: (1) whether each of the Defendants had a legitimate expectation of privacy or "standing"[4] with respect to the issues raised, (2) whether the initial stop was justified, (3) whether the detention of each of the Defendants was proper, and (4) whether there was probable cause to search the vehicle.

## A.    Legitimate Expectation of Privacy

Generally, the defendant has the burden of establishing a legitimate expectation of privacy to assert a Fourth Amendment right. *United States v. Smith*, 263 F.3d 571, 582 (6th Cir. 2001). Thus, a threshold issue raised by the United States is whether Defendants have shown Punto, as the driver-occupant, and Banks, as a passenger-occupant, had a legitimate expectation of privacy in the searched vehicle owned by Lake, who was present during the stop.

A defendant has standing to challenge the admission of illegally obtained evidence only if the defendant's own constitutional rights have been violated. *Rakas v. Illinois*, 439 U.S. 128, 134 (1978). "Fourth Amendment rights are personal [and] may not be vicariously asserted." *United*

---

[4] As stated in *United States v Smith*, 263 F.3d 571, 581-82 (6th Cir. 2001):

> Technically, the concept of "standing" has not had a place in Fourth Amendment jurisprudence for more than a decade, since the Supreme Court in *Rakas v. Illinois*, indicated that the matter of standing in the context of searches and seizures actually involved substantive Fourth Amendment Law. The Court thus dispensed with standing as a "discrete analytic element apart from the merits" in such cases, instead requiring a defendant to prove a legitimate expectation of privacy as a prerequisite to challenging assertedly unlawful police conduct. We therefore use the term "standing" somewhat imprecisely to refer to this threshold substantive determination.

*States v. Myers*, 102 F.3d 227, 231 (6th Cir. 1996) (quoting *Rakas*). A defendant must demonstrate that the search and resulting evidence were the product of that defendant's illegal detention. *See Segura v. United States*, 468 U.S. 796, 815 (1984) ("[E]vidence will not be excluded as 'fruit' unless the illegality is at least the 'but for' cause of the discovery of the evidence.").

As recently reiterated by the United States Court of Appeals for the Sixth Circuit ("Sixth Circuit"), passengers do not have a reasonable expectation of privacy in a searched vehicle. *United States v. Torres-Ramos*, __ F.3d. __, 2008 WL 3078262, * 4 (6th Cir. 2008) (citing *Rakas*). "However, even in cases where no reasonable expectation of privacy exists, a passenger [defendant] may still challenge the stop and detention and argue that the evidence should be suppressed as fruits of illegal activity." *Id.* (internal quotation marks omitted) (citing *United States v. Ellis*, 497 F.3d 606, 612 (6th Cir. 2007)). Both a passenger and the driver have standing to challenge the validity of a vehicle stop under the Fourth Amendment because a police officer's stop of a vehicle results in the seizure of both the passenger and driver alike. *Brendlin v. California*, 127 S. Ct. 2400, 2408 (2007); *see also United States v. Townsend*, 305 F.3d 537, 541-45 (6th Cir. 2002); *United States v. Perez*, 440 F.3d 363, 369 (6th Cir. 2006). Therefore, passengers possess standing to challenge their unlawful seizure and the evidence that flows from the search and seizure. *Torres-Ramos*, 2008 WL 3078262, * 4 (citing *Ellis*, 497 F.3d at 612). Consequently, the Defendants have standing to contest the legality of their seizure and, by extension, to suppress the fruits of any illegal seizure. *Id.*

### B.    The Stop

The Sixth Circuit "has developed two separate tests to determine the constitutional validity of vehicle stops: an officer must have probable cause to make a stop for a civil infraction, and reasonable suspicion of an ongoing crime to make a stop for a criminal violation." *United States*

*v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) (citing *Gaddis v. Redford Twp.,* 364 F.3d 763, 771 n.6 (6th Cir.2004)); *see also Whren v. United States*, 517 U.S. 806, 810 (1996) (the decision to stop an automobile is reasonable where there is probable cause to believe a traffic violation has occurred); *United States v. Sanford*, 476 F.3d 391, 394 (6th Cir. 2007) (same). Whether the police may stop a vehicle based on mere reasonable suspicion of a civil traffic violation is the subject of a conflict in the case law, *see Blair*, 524 F.3d at 748, n.2, but that issue is not raised here because the United States argues Raulston had probable cause to stop the Navigator based on a civil traffic violation.

Defendants assert there was no probable cause to believe a traffic violation occurred. Probable cause is a reasonable ground for belief supported by less than *prima facie* proof but more than mere suspicion. *United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006). The police may lawfully detain a vehicle and conduct a brief stop of its occupants where there is probable cause to believe a traffic violation has occurred, even if the traffic offense is minor and the officer had additional subjective reasons for making the stop. *Whren*, 517 U.S. at 810, 813; *United States v. Herbin*, 343 F.3d 807, 809 (6th Cir. 2003).

A court must evaluate the proffered basis for a stop against the standard of whether it was objectively reasonable, given the totality of the circumstances. In *Illinois v. Gates*, 462 U.S. 213 (1983), the Supreme Court made clear that a determination of probable cause involves the exercise of a "practical, common-sense judgment." 462 U.S. at 244. Significantly, the Supreme Court observed that the establishment of probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity. By hypothesis, therefore, innocent behavior frequently will provide the basis for a showing of probable cause . . . ." *Id.* at 243 n.13. Describing the perspective from which a reviewing court should evaluate a law enforcement

officer's determination of probable cause when making a traffic stop, the Sixth Circuit has held "all probable cause determinations [are] fact-dependent and will turn on what the officer knew *at the time he made the stop*." *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993) (emphasis in original).

Raulston testified he observed the Navigator speeding and determined the decorative tag bracket was a registration violation. Thus, the United States argues Raulston had probable cause for the stop. While perhaps putting it somewhat more delicately, Defendants essentially argue Raulston is not credible and had no independent basis for the stop. Defendants also contend the registration was actually valid – contrary to Lewis's report that the registration was expired – and a mistaken belief does not support probable cause.

I **CONCLUDE** it is not necessary for this Court to determine whether Lewis's reasons for, and direction to Raulston with respect to, the stop of the Navigator, standing alone, are sufficient to support probable cause or whether a mistaken belief that a civil traffic infraction occurred supports probable cause in this case. I **FIND** Raulston had valid reasons for initiating a traffic stop based upon his own credible observations of the Navigator speeding and the decorative tag bracket, which obscured the registration sticker.

The Defendants question the credibility of Raulston's claim that the Navigator was speeding because Raulston did not mention speeding in the warning citation issued to Punto or on the videotape of the stop. Raulston testified he did not mention the speeding violation because Lake was being argumentative about whether his registration was expired. While there were some inconsistencies in Raulston's testimony, and it is somewhat troubling that speeding is not mentioned to the Defendants or Lake as a basis for the stop on the videotape or in the citation, Raulston's

explanation for his failure to mention speeding is reasonable, especially given that the excess speed was no more than 7 m.p.h. over the speed limit.

As to credibility in general, Lewis's explanation of why he turned off his audio equipment during portions of the stop, such as while he communicated with the Jeep's occupants and spoke to Raulston over a cellular telephone, is questionable. However, actions taken by Lewis during his stop of the Jeep are not directly at issue and do not directly impact Raulston's credibility. Raulston's portions of the communications are captured, for the most part, on his audio equipment and he took no steps to prevent the audio equipment from recording his communications.

While Raulston indicated he was not certain about some details regarding the night in question, Raulston never wavered in his testimony that he personally clocked the Navigator speeding. Raulston's testimony is corroborated by the video evidence where Lewis specifically mentions he clocked one of the vehicles speeding as they traveled together, and there has been no suggestion that the Navigator slowed down at some point prior to the appearance of Raulston. The inconsistencies in Raulston's testimony do not indicate he fabricated that the Navigator was speeding as an after-the-fact justification for the stop. Therefore, I **FIND** the United States has met its burden of establishing the necessary probable cause for the initial stop and the proffered basis for the stop is objectively reasonable, given the totality of the circumstances.

As to Defendants' suggestion that the stated reasons for the stop were mere pretext designed to obscure that the Navigator was impermissibly stopped on a "hunch," the Supreme Court has held a law enforcement officer's actual motives or subjective intent are irrelevant in determining whether a traffic stop is proper. *Whren*, 517 U.S. at 813 ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."). "[S]o long as the officer has probable cause to

believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment." *Ferguson*, 8 F.3d at 391. The subjective intent of an officer in stopping a vehicle simply has little to no relevance as long as the necessary probable cause exists. *Blair*, 524 F.3d at 748. Thus, pursuant to *Whren* and *Ferguson*, the fact that it appears Lewis and Raulston had an investigatory agenda is irrelevant for purposes of suppression.

Accordingly, I **FIND** the United States has shown sufficient probable cause to believe a civil traffic violation occurred to support the stop.

### C.     The Detention

The more difficult issues in this case involve the detention. Finding a traffic stop justified and valid at its inception does not end the Forth Amendment inquiry because any detention of the Defendants must be reasonable. Defendants argue that, notwithstanding whether the original basis for the stop was valid, the subsequent scope and duration of the detention was unreasonably protracted. The United States counters the scope and detention were reasonable and lawful under the circumstances.

When a vehicle is lawfully stopped, an officer may request a driver's license and vehicle registration from the driver. *See Berkemer v. McCarty*, 468 U.S. 420, 437 (1984); *Hill,* 195 F.3d at 269. The occupants of a vehicle may be detained until after the officer has finished verifying the driver's license, checking other records, and issuing a citation, as these acts are within the purpose of the initial stop. *See United States v. Wellman*, 185 F.3d 651, 656 (6th Cir. 1999); *United States v. Bradshaw*, 102 F.3d 204, 212 (6th Cir. 1996). Detention of a suspect until the completion of records checks regarding the vehicle and driver and the issuance of a citation for a traffic violation are "well within the bounds of the initial stop." *Bradshaw*, 102 F.3d at 212.

In *United States v. Burton*, the Sixth Circuit addressed whether it was reasonable for an officer to ask someone detained during a traffic stop a few questions that were unrelated to the initial reason for the traffic stop. 334 F.3d 514, 518-19 (6th Cir. 2003). In *Burton* the officer initiated a traffic stop due to a curbside parking violation, and he spoke with the driver outside the stopped vehicle regarding his driver's license, ownership of the vehicle, and whether anything illegal was inside. *Id.* at 515. The officer then asked whether the driver would consent to a search of the vehicle, to which the driver agreed. *Id.* at 516. On review, the Sixth Circuit concluded the scope and duration of the traffic stop were reasonable because the handful of questions the officer asked the driver were not unusually intrusive and did not make the traffic stop any more coercive than a typical traffic stop. *Id.* at 518-19; *see also Ellis*, 497 F.3d at 613-14 (questions about the occupants' itinerary, reasons for travel and identification are reasonablely related to a traffic stop and not overly intrusive); *Hill*, 195 F.3d at 268 (officer may ask questions about identity, travel plans and consent during traffic stop).

Once the purpose of the traffic stop is completed, officers "may not 'further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention.'" *Perez*, 440 F.3d at 370 (6th Cir. 2006) (quoting *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995)). The Sixth Circuit has held that "[u]nder the Fourth Amendment, even the briefest of detentions is too long if the police lack a reasonable suspicion of specific criminal activity. *United States v. Urrieta*, 520 F.3d 569, 578 (6th Cir. 2008) (citing *Townsend*, 305 F.3d at 541, 545). Thus, in order to detain the Defendants beyond the purpose of the original traffic violation, *i.e.*, to issue a ticket for speeding and/or registration violations, Raulston must have had a reasonable suspicion criminal activity was afoot. Otherwise,

the continued detention constituted an illegal seizure of the Navigator's occupants. *Torres-Ramos*, 2008 WL 3078262, * 5 (citing *Terry v. Ohio*, 392 U.S. 1, 18 (1968)).

Like in *Torres-Ramos*, before turning to the issue of reasonable suspicion here, the proper scope and duration of the traffic stop must be determined. There is a dispute regarding when Raulston knew (or should have known) Punto's license was valid. Based on Chestnut's affidavit, about five minutes passed between the time the stop began and the CPD server had information that Punto's New York license was valid. Raulston testified he did not know Punto had a valid license until after he obtained Lake's license and perhaps not until he heard back from BLOC almost 30 minutes later. About nine minutes passed between the time the stop was initiated and the time Lake showed Raulston a valid registration sticker on the tag. Raulston testified that in spite of this proof and the Catoosa County citation, the CPD computer showed the registration had expired. Raulston requested information from BLOC regarding the Navigator, Punto and Lake around 1:11 a.m. and about four minutes later, at 1:15 a.m., Lake produced registration documentation. At 1:34:38 a.m., Raulston received information regarding Punto, Lake and the Navigator back from BLOC, and a few minutes later he called for back-up. He then asked BLOC for a records check on Banks and his call with BLOC ended around 1:42 a.m. At 1:44 a.m., he asked Banks to step out of the Navigator and around 1:47 a.m. Raulston indicated to Punto he was writing a citation, which he gave to her at 1:53 a.m., about the time of the canine sniff.

Since the United States justifies the search of Lake's vehicle on the drug-detection dog's alert, the period of detention prior to the Copper's alert is at issue. Some 30 minutes passed between the initiation of the stop and Raulston's request for a canine unit and about 58 minutes passed between the initial stop and the alert by Copper on the Navigator. A dispute exits about when the

purpose of the traffic stop ended and further detention based on an alleged reasonable suspicion of criminal activity began. Defendants appear to contend the purpose of the initial stop was completed no later than 15 minutes after the stop when Lake showed Raulston the valid registration paperwork. The United States appears to argue the purpose was not completed until a citation was issued at about the same time as the dog alert.

Defendants have presented evidence indicating the CPD received information about the validity of Punto's driver's license early in the stop and almost instantaneously upon request. The issue of when the original purpose of the traffic stop ended and the detention began is complicated by the dispute regarding the information available to Raulston. Nothing on the videotape contradicts Raulston's testimony that he did not receive information verifying Punto's license information before obtaining Lake's license, although he was uncertain of exactly when he did receive the information. However, it certainly appears the information was sent to, at least, the CPD at 1:03 a.m. based on the affidavit of Chestnut. Defendants have also introduced evidence that tends to show the validity of the registration could have been determined fairly quickly after the initial stop if Raulston had chosen to rely upon the registration sticker, registration paperwork, and the prior Catoosa County stop paperwork.

As noted, it appears Defendants contend the purpose of the traffic stop should have been completed by 1:15 a.m., when Lewis showed Raulston his registration paperwork. Although it appears the United States contends the purpose of the traffic stop was not completed until the BLOC information was returned at 1:34:38 at the earliest or until the warning citation was issued just prior to Copper's deployment, I will address this matter as if the original purpose of the stop was completed around 1:15 a.m.

As noted above, it is settled that when the purpose of a traffic stop has been accomplished, an officer cannot further detain a vehicle or its occupants unless facts occur that would generate reasonable suspicion to justify further detention. *Terry*, 392 U.S. 1; *United States v. Saucedo*, 226 F.3d 782, 788 (6th Cir. 2000)*; Weaver v. Shadoan*, 340 F.3d 398, 408 (6th Cir. 2003); *Mesa*, 62 F.3d at 162. Reasonable suspicion is more than a hunch but "considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Hurst*, 228 F.3d 751, 757 (6th Cir. 2000) (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). Reasonable suspicion must be supported by specific articulable facts. *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998). "[A] policeman who lacks probable cause but whose 'observations lead him reasonably to suspect' that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to 'investigate the circumstances that provoke suspicion.'" *McCarty*, 468 U.S. at 439 (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975)). Based upon the totality of the circumstances, "the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). Under such circumstances, the suspect may be briefly detained to investigate the suspicious circumstances. *Id.*

In *United States v. Sharpe,* 470 U.S. 675, 686 (1985), the Supreme Court held that in assessing whether a detention is too long in duration to be justified as an investigative stop, it is proper to examine whether the police diligently pursued a means of investigation likely to confirm or dispel their suspicions quickly. Thus, the focus is on the diligence of the police and is not on the length of the detention. *United States v. Calderon-Valenzuela*, Nos. 98-4353, 98-4355, 2000 WL 571953, at * 4 (6th Cir. May 3, 2000). Generally, if a detention exceeds its proper scope, then any

evidence seized during the illegal detention must be suppressed as fruit of the poisonous tree. *Hill*, 195 F.3d at 264.

In arguing reasonable suspicion, the United States includes the facts known to Raulston from the time he was first contacted about initiating the stop through the arrival of the canine unit. The United States argues Raulston developed a reasonable suspicion of criminal activity predicated on: (1) the conflicting answers given by the occupants of the two vehicles; (2) the two vehicles were traveling together, but the Navigator continued down I-24 after the Jeep was stopped; (3) the Jeep's rental agreement was out of territory and overdue; (4) the renter of the Jeep was not in either vehicle despite indications to the contrary; (5) Banks's original denial concerning knowledge of an occupant in the Jeep and subsequent change in her story; and (6) the BLOC report regarding Lake's history of drug smuggling and credit card fraud. The United States also argues Raulston was not required to rely upon the Catoosa County paperwork and inferences to be drawn from it regarding the registration and that the nervousness detected by Raulston should not be easily disregarded. Finally, the United States contends the Court should not find the officers lied in giving their testimony [Doc. 67 & 73].

Defendants argue the evidence of "nervous" behavior amounts to nothing more than normal pacing on a cold night and the so-called argumentative behavior was justified based upon the circumstances. Defendants also argue the conflicting stories were understandable given that Banks was simply concerned about revealing her relationship with a married occupant of the Jeep and, because Nashville is on the way to Memphis, the final destination information was not necessarily inherently inconsistent [Doc. 71 & 72].

By the time Raulston was provided with registration paperwork by Lake, and thus when he

decided to detain the Defendants, he was aware of what he considered to be unusually argumentative, "standoffish" and nervous behavior by the owner of the Navigator, Lake. As to "nervousness," the Sixth Circuit has repeatedly held "[a]lthough nervousness may be considered as part of the overall circumstances giving rise to a reasonable suspicion, this court has found nervousness inherently *unsuspicious,* and has therefore given it very limited or no weight in the reasonable-suspicion calculation." *Urrieta*, 520 F.3d at 577 (emphasis in original) (citing *United States v. Richardson*, 385 F.3d 625, 630-31 (6th Cir. 2004); *United States v. Andrews*, 600 F.2d 563, 566 (6th Cir. 1979)). Raulston also knew the two vehicles had been traveling together until Lewis began following the vehicles to initiate his stop and the vehicles separated. Raulston thought there was a young Hispanic girl in the back of the Navigator. He knew the renter of the overdue and out-of-territory Jeep, Chang, was reportedly in the Navigator, but was neither Punto nor Lake. When Lake approached with the registration paperwork, something Raulston indicated was also somewhat unusual behavior, Lake told Raulston they were "not now" traveling with another vehicle. Lewis had already reported to Raulston that an occupant of the Jeep admitted they were traveling together. Raulston also asked who was in the backseat of the Navigator and presumably learned it was Banks, not Chang.

I **FIND** Raulston's observations at this point led him reasonably to suspect that someone in the Navigator had committed, was committing, or was about to commit a crime. Thus, Raulston was justified in his decision to briefly detain the Navigator's occupants in order to more fully investigate the circumstances that provoke his suspicion.

The next issue is whether Raulston had sufficient suspicion of criminal activity to extend the scope and duration of the detention to the extent set forth herein. In addition to what he already

knew around 1:15 a.m., Raulston's further investigation definitively determined the renter of the Jeep was not present in the Navigator. Raulston also asked Lake again about the conflicting story on whether the two vehicles were traveling together and Lake then admitted they were traveling together. The occupants of the Navigator stated they are going to Nashville to party and the occupants of the Jeep reportedly stated they were traveling to Memphis, destinations Raulston considered to be inconsistent.[5] Punto and Banks said they did not know the occupants of the Jeep after Lake said they did. Banks later admitted her initial lie about not knowing the occupants of the Jeep. Around 1:27 Raulston also learned Lake had a large sum of money on his person. About a minute later, he requested the canine unit. Before the canine unit arrived, Raulston received additional information from BLOC that the registration and licenses of the occupants were valid and there were no outstanding warrants, but he also learned of Lake's extensive criminal history.

I **FIND** the scope and length of the detention were reasonable given the totality of the circumstances. While none of the facts listed above, standing alone, necessarily create reasonable suspicion, in combination the facts generate reasonable suspicion to justify further detention and expansion of the original scope of the traffic stop. The diligence exhibited by Raulston and the other officers involved reveals they did not unreasonably extend the detention of Defendants. The length of the delay in this case of approximately 58 minutes – measured from the initial stop to the canine alert, 45 minutes – measured from the time Lake provided registration paperwork to the canine alert, and 15 minutes – measured from the time the BLOC call was completed to the canine alert, was not excessive. *See, e.g., United States v. Avery*, 137 F.3d 343, 350-51 (6th Cir. 1997) (holding twenty-

---

[5] Raulston admitted on cross examination that he assumed these were inconsistent *final* destinations.

five minute delay during investigatory stop was reasonable); *United States v. Knox*, 839 F.2d 285, 290-91 (6th Cir. 1988) (holding thirty minute delay during investigatory stop was reasonable*); United States v. Garcia*, 496 F.3d 495, 504 (6th Cir. 2007) ("the duration of the stop was reasonable; the canine sniff was performed within a half hour of the stop"); *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005) (police had reasonable suspicion to detain suspect for thirty to forty-five minutes to wait for the first drug-detection dog to arrive); *United States v. Orsolini*, 300 F.3d 724, 730 (6th Cir. 2002) (detention reasonable where investigation lasted less than one hour with some 35 minutes spent waiting for the canine unit to arrive)

Accordingly, I **FIND** the United States has met its burden of showing Raulston diligently pursued a means of investigation that was likely to confirm or dispel his suspicions quickly, his suspicions were reasonable, and the scope and length of the detention were reasonable given the totality of the circumstances

**D.      Search**

Based on the very recent *Torres-Ramos* decision, which was issued after the parties filed their final briefs, it appears both Defendants have standing to assert the drug-detection dog, Copper, was insufficiently reliable to establish probable cause for the search of the Navigator.  *See* 2008 WL 3078262, * 8.  Therefore, it is unnecessary to further address the parties' arguments on the issue of standing,[6] especially given my conclusion that Copper was sufficiently reliable to establish probable

---

[6] As argued by the United States, there is no evidence Punto or Banks had any proprietary or possessory interest in the credit cards and IDs found underneath the console or in the laptop computers or credit card encoder found in the back of the vehicle.  There is also no evidence Punto was anything more than a temporary driver, subject to the direction and control of the vehicle's owner, Lake, who was present during the search.  No evidence was presented by Punto of any type of relationship with Lake.

cause for the search of the Navigator

Both the Supreme Court and the Sixth Circuit have repeatedly recognized a dog sniff conducted during a lawful stop that reveals no information other than the location of contraband does not violate the Fourth Amendment. *See e.g., City of Indianapolis v. Edmond*, 531 U.S. 32, 40 (2000); *United States v. Place*, 462 U.S. 696, 707 (1983); *Davis*, 430 F.3d at 355. Certainly, when officers reasonably suspect the occupants of a vehicle of illegal drug trafficking, a "canine narcotics sniff is directly related to investigating this suspicion." *Garcia*, 496 F.3d at 504. The Supreme Court has held the use of a drug-sniffing dog that does not extend the length of a legitimate traffic stop does not violate the Fourth Amendment even where there are no specific and articulable facts to suggest drug activity. *Illinois v. Caballes*, 543 U.S. 405, 408-09 (2005). As noted above, I have concluded the scope and duration of the detention was reasonable in this case.

Although searches must normally be conducted pursuant to a warrant, under the well-known automobile exception, a warrantless search of a vehicle that has been stopped lawfully is permissible if the search is based upon probable cause. *United States v. Ross*, 456 U.S. 798, 823 (1982); *United States v. Pasquarille*, 20 F.3d 682, 690 (6th Cir.1994). Defendants argue the dog alert was insufficient to give the deputies probable cause for their warrantless search of the Navigator because the United States has not proven Copper was reliable. The key component of drug-dog detection is the communication by the dog that she or he has detected a targeted scent and the recognition of the dog's handler that the scent has been detected. *United States v. Howard*, 448 F. Supp. 2d 889, 899 (E.D. Tenn. 2006). This is what is commonly referred to as an "alert." For a "dog's alert to be admitted on the issue of probable cause, all that is required is evidence the dog is generally certified as a drug-detection dog." *Id.* at 895. It is well established in the Sixth Circuit that certification of a drug-detection dog is *prima facie* proof of the dog's credibility, which may then be rebutted by

evidence regarding the dog's performance or training. *See e.g., United States v. Diaz*, 25 F.3d 392, 394-95 (6th Cir. 1994); *Howard*, 448 F. Supp. 2d at 897-98.

Allen testified a valid alert occurred at the Navigator, and that Copper was certified and well trained. "[T]he primary issue in determining the credibility of a dog's alert in not the capability or ability of a dog to accurately identify particular scents, but is instead the communication between the handler and the dog based on that indisputable ability." *Howard*, 448 F. Supp. at 897-98. Thus,

> [t]he fundamental determination in evaluating the training and reliability of a drug-detection dog is the credibility of the handler's testimony. Because the handler is the only witness who can speak to the subjective interaction during a particular dog alert, it is necessary to defer to his testimony if it is found to be credible.

*Id.* at 899-90.

Allen's credible testimony, as an experienced and trained canine handler, was that there was an alert on the Navigator by Copper. Allen indicated Copper may have alerted on residual odors. Defendants have not argued Allen's testimony is not credible. Instead, Defendants argued Copper may not have properly alerted based on the testimony/actions of Lewis and Raulston and Copper may not have been reliable given the absence of drugs in the searched vehicles.

Both Lewis and Raulston testified they did not know how to tell whether Copper had alerted and relied upon Allen for such information. Neither Lewis's failure to document the alert nor Raulston's questions about the nature of the alert on the night at issue are sufficient to call into question Allen's testimony regarding the alert. Likewise, the fact that drugs were not found in the searched vehicles does not indicate Copper was unreliable given Allen's testimony about Copper's training, ability and performance. *See Torres-Ramos*, 2008 WL 3078262, * 9 (citing *e.g. Diaz*, 25 F.3d at 396 (a low percentage of false positives is not necessarily fatal to a finding that a drug

detection dog is properly trained and certified)).  Thus, Defendants' arguments with respect to Copper's alert fail.

I **FIND** there is sufficient evidence that Copper is well-trained, certified, and reliable for purposes of establishing probable cause.  The use of a drug-detection dog is an accepted investigative technique in the Sixth Circuit and when a properly trained and certified drug-detection dog alerts to an item, the alert alone constitutes probable cause for a search.  *See Id*; *Diaz*, 25 F.3d at 394-95 (6th Cir. 1994); *United States v. Lattner,* 385 F.3d 947, 951 (6th Cir. 2004), *cert. denied*, 543 U.S. 1095 (2005).  Thus, I **FIND** Raulston, who already had suspicions concerning Defendants' involvement in criminal activity, had probable cause for the search of the Navigator based upon Copper's alert.

## IV.    Conclusion

For the reasons stated herein, I **RECOMMEND** that Defendants' joint motion [Doc. 35] be **DENIED**.[7]

s/*Susan K. Lee*

SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[7] Any objections to this report and recommendation must be served and filed within ten days after service of a copy of this recommended disposition on the objecting party.  Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure.  Failure to file objections within the time specified waives the right to appeal the district court's order.  *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985).  The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general.  *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).